Case No. 22-1075

# IN THE UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

**Dr. Miriam Brysk,**

*Plaintiff-Appellant*

v.

**Henry Herskovitz, Gloria Harb, Tom Saffold, Rudy List, Chris Mark,
Deir Yassin Remembered, Inc., Jewish Witnesses for Peace and Friends,
The City of Ann Arbor, Ann Arbor Mayor Christopher Taylor,
in his official and individual capacities,
Ann Arbor Community Services Administrator Derek Delacourt,
in his official and individual capacities, Ann Arbor City Attorney
Stephen Postema, in his official and individual capacities,
and Senior Assistant City Attorney Kristen Larcom,
in her official and individual capacities, jointly and severally,**

*Defendants-Appellees*

---

**On appeal from the United States District Court
For the Eastern District of Michigan
Honorable Victoria Roberts, Case No. 2:19-cv-13726**

---

**PLAINTIFF-APPELLANT/CROSS-APPELLEE MIRIAM BRYSK'S
CORRECTED FIRST APPELLATE BRIEF**

**ORAL ARGUMENT REQUESTED**

---

Marc M. Susselman (P29481)
Attorney for Appellant Miriam Brysk
43834 Brandywyne Rd.
Canton, Michigan 48187
(734) 416-5186
marcsusselman@gmail.com

# TABLE OF CONTENTS

TABLE OF AUTHORITIES.................................................. iii

STATEMENT IN SUPPORT OF ORAL ARGUMENT.............. x

STATEMENT OF JURISDICTION………………………………… xi

STATEMENT OF ISSUES…………………………………………… xii

STATEMENT OF THE CASE............................................ 1

SUMMARY OF THE ARGUMENT……………………………... 5

STANDARD OF REVIEW………………………………………... 6

ARGUMENT            ....................................................... 7

I.    THE DISTRICT COURT'S ATTORNEY FEE ORDER
      APPLIED THE LAW IMPROPERLY AND DISREGARDED
      THE HOLDING OF THE CIRCUIT COURT MAJORITY
      THAT THE LEGAL CLAIMS PLED IN THE FIRST
      AMENDED COMPLAINT WERE NOT FRIVOLOUS.   ……… 7

II.   EVEN IF PLAINTIFFS' CLAIMS WERE FRIVOLOUS,
      THE PROTESTERS ARE ENTITLED TO RECOVER
      ATTORNEY FEES FOR DEFENDING AGAINST
      THOSE CLAIMS ONLY, NOT FOR ANY TIME DEVOTED
      TO THE STANDING ISSUE. ………………………………….  36

      A.    The District Court Misapplied The Holding Of *Fox v. Vice*,
            563 U.S. 826 (2011)………………………………………. 36

      B.    The Protesters' Attorneys' Time Records Failed To
            Segregate Time They Spent On The First Amendment
            And Federal Civil Rights Statutory Issues From The Time
            They Spent On The Standing Issue……………………. 39

CONCLUSION ...................................................... 44

CERTIFICATE OF COMPLIANCE……………………………….. 46

CERTIFICATE OF SERVICE........................................... 47

ADDENDUM…………………………………………………….. 48

**INDEX OF EXHIBITS**……………………………………………… 50

# TABLE OF AUTHORITIES

**CASES**                                                              Pages

    **Federal**

*Beauharnais v. Illinois,*
    343 U.S. 250 (1954) ....................................................... 30

*Bell v. Prefix Inc.,*
    784 F. Supp.2d 778 (E.D. Mich. 2011)....................................... 40

*Berry v. Schmitt,*
    638 F.3d 290 (6th Cir. 2012)........................................... 31

*Bible Believers v. Wayne County,*
    805 F.3d 228 (6th Cir. 2015)........................................... 30

*Board of Education v. Barnette*
    319 U.S. 624 (1943) ..................................................... 12

*Bray v. Alexandria Clinic,*
    506 U.S. 263 (1993)...................................................... 23

*Bridges v. California,*
    314 U.S. 252 (1941) ..................................................... 32

*Brokaw v. Mercer County,*
    235 F.3d 1000 (7th Cir. 2000).......................................... 23

*Burton v. Wilmington Pkg. Authority,*
    365 U.S. 715 (1961) ..................................................... 22

*Cantwell v. Connecticut*
    310 U.S. 296 (1941) .......................................... 12,13,14,30

*Chaplinsky v. New Hampshire,*
    315 U.S. 565 (1943) .................................................. 13,30

*Chapman v. Higbee Co.,*
319 F.3d 825 (6th Cir. 2003), *cert. denied,* 542 U.S. 945 (2004).     20

*Christiansburg Garment Co. v. Equal Employment Opportunity Comm'n,*
434 U.S. 412 (1978) ..................................................................... 8,9,16,17,25

*Clajon Production Corp. v. Petera,*
70 F.3d 1566 (10th Cir. 1995) ....................................................... 7

*Collin v. Smith,*
578 F.2d 1197 (7th Cir. 1978) ........................................................ 10

*Daniels v. Board of Education of the Ravenna City School District,*
805 F.2d 203, 207 (6th Cir. 1986) ................................................. 21,22

*Fharmacy Records v. Simmons,*
Case NO. 05-72126 (E.D. Mich. 2006) ........................................ 40

*Fox v. Vice,*
563 U.S. 826 (2011) ....................................................................... 37,38,39,44

*Frisby v. Schultz,*
487 U.S. 474 (1988) ....................................................................... 9

*Garner v. Cuyahoga Cty. Juv. Ct.,*
554 F.3d 624 (6th Cir. 2009) .......................................................... 25,29

*Gerber v. Herskovitz,*
14 F.4th 500 (2021) ........................................................................ 14,15,32

*Girouard v. United States,*
328 U.S. 61 (1946) ......................................................................... 30

*Granzeier v. Middleton,*
173 F.3d 568 (6th Cir. 1999) .......................................................... 37

*Griffin v. Breckenridge,*
403 U.S. 88 (1971) ......................................................................... 23

*Haffner v. Brown,*
    983 F.2d 570 (4th Cir. 1992)........................................................ 25

*Hashem-Younes v. Danou Enterprises, Inc.,*
    No. 06-CV-15469, 2008 WL 786759 (E.D. Mich. Mar. 20, 2008) 22,23

*Hensley v. Eckerhart,*
    461 U.S. 424 (1983) ........................................................ 36

*Hobby v. United States*
    468 U.S. 339 (1984) ........................................................ 35

*Howard v. Secretary Of Health Human Services,*
    932 F.2d 505 (6th Cir. 1991)........................................................ 34

*Hughes v. Rowe,*
    449 U.S. 5 (1980) ........................................................ 9,17,25

*In re Dwayne Miedzianowski, Corp.,*
    735 F.3d 383 (6th Cir. 2013)........................................................ 18

*Jews for Jesus, Inc. v. Jewish Community Relations Council of New York, Inc.,*
    968 F.2d 286 (2d Cir. 1992)........................................................ 23

*Jobe v. City of Catlettsburg,*
    409 F.3d 261 (6th Cir. 2005)........................................................ 22

*Jones v. Continental Corp.,*
    789 F.2d 1225 (6th Cir. 1986)........................................................ 19

*Lehman v. City of Shaker Heights,*
    487 U.S. 298 (1974) ........................................................ 10

*Liteky v. United States,*
    510 U.S. 540 (1994) ........................................................ 33

*Loubser v. Thacker,*
    440 F.3d 439 (7th Cir. 2006)........................................................ 25

*Madsen v. Women's Health Center, Inc.,*
    512 U.S. 753 (1994) ....................................................... 11

*Mason v. Mitchell,*
    729 F.3d 545 (6th Cir. 2013)........................................... 18

*McDonnell Douglas Corp. v. Green,*
    411 U.S. 792 (1973) ....................................................... 21

*McWhorter v. City of Birmingham,*
    906 F.2d 674 (11th Cir. 1990)......................................... 34

*Miller v. Commodities Futures Trading Comm'n,*
    197 F.3d 1227 (9th Cir. 1999)......................................... 34

*Minersville District v. Gobitis,*
    310 U.S. 586 (1940) ....................................................... 12

*Mitchell v. City of Moore, Oklahoma,*
    218 F.3d 1190 (10th Cir. 2000)....................................... 20

*Ne. Ohio Coal. for the Homeless v. Husted*
    831 F.3d 686 (6th Cir. 2016)............................................. 6

*Pangburn v. Culbertson,*
    200 F.3d 65 (2d Cir. 1999)............................................. 24

*Perry v. AutoZone Stores, Inc.*
    624 F. App'x 370 (6th Cir. 205)..................................... 40

*R.A.V. v. St. Paul,*
    505 U.S. 377 (1992) ....................................................... 22

*Reeves v. Rose,*
    108 F. Supp.2d 720 (E.D. Mich. 2000)......................... 21

*Riverside v. Rivera,*
    477 U.S. 561 (1986) ......................................................... 7

*Shaare Tefila Congregation v. Cobb,*
 481 U.S. 615 (1987) ...................................................................... 24

*Smith v. Jefferson County Bd. Of Sch. Comm'rs,*
 788 F.3d 580 (6th Cir. 2015) .......................................................... 37

*Smith v. Smythe-Cramer Co.,*
 754 F.2d 180 (6th Cir. 1985) .......................................................... 19

*Snyder v. Phelps,*
 562 U.S. 443 (2011) ...................................................................... 10

*Standing Committee v. Yagman,*
 55 F.3d 1430 (9th Cir. 1995) .......................................................... 31

*Survivors Network of those Abused by Priests, Inc. v. Joyce,*
 779 F.3d 785 (8th Cir. 2015) .......................................................... 14

*Tartar v. Raybuck,*
 742 F.2d 977 (6th Cir. 1984) .......................................................... 19

*United States v. Schwimmer,*
 279 U.S. 644 (1929) ...................................................................... 30

*U.S. v. Moored,*
 38 F.3d 1419 (6th Cir. 1994) .......................................................... 18

*U.S. v. State of Mississippi,*
 921 F.2d 604 (5th Cir. 1991) .......................................................... 19

*Virginia v. Black,*
 538 U.S. 343 (2003) ...................................................................... 10

*Ward v. Rock Against Racism,*
 491 U.S. 781, 791 (1989) ................................................................ 10

*Wells v. Rhodes,*
 928 F. Supp. 2d 920 (S.D. Ohio 2013) ........................................ 22,23,34

*Young v. Fire Ins. Exchange,*
    338 U.S. 912 (1950) ....................................................................... 11

**<u>UNITED STATES CONSTITUTION</u>**

U.S. Const. amend. I     ...................................................... *passim*

**<u>STATUTES</u>**

    **<u>Federal</u>**

42 U.S.C. §1981     ...................................................... *passim*

42 U.S.C. §1982     ...................................................... *passim*

42 U.S.C. §1983     ...................................................... *passim*

42 U.S.C. §1985(3)     ...................................................... *passim*

42 U.S.C. §1986     ...................................................... *passim*

Federal Housing Act, 42 U.S.C. §3601 *et seq.*...................................... 21

    **<u>Michigan</u>**

M.C.L. §750.411h     ...................................................... 20

**<u>COURT RULES</u>**

Fed. P. Civil P. 12(b)(1)     ...................................................... *passim*

Fed. R. Civil P. 12(b)(6)     ...................................................... 2,25

**<u>MISCELLANEOUS</u>**

A Proclamation on Days of Remembrance Of Victims Of the Holocaust, 2022    31

Canon 2(A) of the Code of Conduct for United States Judges ..............    35

122 Cong. Rec. 33313 (1976) (remarks of Sen. Tunney) .....................    7

Deuteronomy 16:20  ...........................................................  36

## <u>STATEMENT IN SUPPORT OF ORAL ARGUMENT</u>

Appellant requests oral argument in support of the appeal because the District Court's decision awarding attorney fees to the Protester Defendants contravenes significant Supreme Court precedent which has held that in the context of civil rights advocacy awarding attorney fees to defendants can have a chilling effect on the willingness of attorneys to accept such cases. The District Court's conclusion that the claims in this lawsuit were frivolous was not supported by the record and contrary to the holding of the appellate panel's majority. This conclusion was further compounded by the District Court's determination that attorney fees should also be awarded for time expended by the attorneys on the issue of standing, an issue on which the Protester Defendants did not even prevail. Given the anti-Semitic character of the Protester Defendants' speech, rewarding that speech with an award of attorney fees in the amount of $158, 721.75 raises the specter of the appearance of bias on the part of the District Court judge, a specter which has serious implications for public confidence in the integrity and impartiality of the federal judiciary.

# STATEMENT OF JURISDICTION

A.      The District Court's jurisdiction was based on 28 U.S.C. §§1331 and 1343, since Appellant was alleging violations of her constitutional rights and violations of federal statutes.

B.      The Court of Appeals has jurisdiction pursuant to 28 U.S.C. §1291, since the District Court entered a final Order (R. 103) and Judgment (R. 104), on January 25, 2022, awarding attorney fees to the Protester Defendants/Appellees.

C.      Plaintiff/Appellant Miriam Brysk filed her Notice of Appeal (R. 107) on February 3, 2022.

D.      The instant appeal is from final Order and Judgment and disposes of all of the parties' claims.

# **STATEMENT OF ISSUES PRESENTED FOR REVIEW**

I.     Whether the District Court's Order and Judgment requiring that Dr. Miriam Brysk, a Holocaust survivor, and her attorney pay attorney fees to the Protester Defendants (hereinafter "Protesters") in the amount of $158,721.75 pursuant to 42 U.S.C. §1988 based on the court's conclusion that the claims pled in the First Amended Complaint were frivolous, is contrary to established Supreme Court precedent relating to awarding attorney fees to defendants in lawsuits in which the plaintiff seeks to vindicate rights guaranteed under the various civil rights statutes, and where the court's ruling is contrary to the holding by the majority of the Sixth Circuit panel that the claims were not frivolous.

Appellant answers "Yes.'

II.     Whether, even assuming that the claims pled by Plaintiffs were frivolous, the court's ruling that the Protesters were entitled to recover attorney fees for the time expended by their attorneys on the issue of whether Plaintiffs had standing, an issue on which the Protesters did not prevail, is contrary to the holdings of *Hensley v. Eckerhart,* 461 U.S. 424 (1983), and *Fox v. Vice,* 563 U.S. 826 (2011).

Appellant answers "Yes."

**III.**   Whether because the Protesters' attorneys used block-billing which prevents determining how much time was expended on the issue of standing, versus how much time was expended on the issues on which they prevailed, the Protesters are not entitled t recover any attorney fees.

Appellant answers "Yes."

## <u>STATEMENT OF THE CASE</u>

The instant lawsuit was commenced on December 19, 2019, against a group of Protesters who were picketing in front of Beth Israel Synagogue ("Synagogue"), located in a residentially zoned district in Ann Arbor, Michigan. (Complaint, R. 1) The Protesters had been picketing the Synagogue every Saturday morning for then 17 years, using signs which included such anti-Semitic messages as "Resist Jewish Power"; "Jewish Power Corrupts"; "No More Holocaust Movies," commingled with signs relating to the Israel- Palestinian conflict. (Photographs of signs in front of the Synagogue, and the Israeli flag with the Jewish Star of David defaced, were attached to the Complaint, R. 1, and the subsequently filed First Amended Complaint, R. 11, as Exhibit 3; and signs facing the Synagogue from across Washtenaw Ave., were attached as Exhibit 4.)

The lawsuit sought an injunction placing reasonable time, place and manner restrictions on the Protesters' conduct, as well as damages for violating several federal statutes, 42 U.S.C. §§1981, 1982, 1983, 1985(3), and 1986. Two individuals who attended Jewish services at the Synagogue, and at an annex next to the Synagogue, were named as Plaintiffs, Marvin Gerber and Dr. Miriam Brysk, a Holocaust survivor. Plaintiffs alleged in the First Amended Complaint ("FAC") (R. 11) that seeing the signs as they approached and entered the Synagogue and annex in order to participate in the Sabbath prayer service caused them extreme emotional

distress. Plaintiffs repeatedly made clear in the FAC and in their briefs that they were not claiming the Protesters' conduct was not protected by the 1st Amendment, and that they had the right under the 1st Amendment to express their anti-Israel and anti-Semitic sentiments anywhere in Ann Arbor, or elsewhere. They only maintained that their right to exercise their free speech to express these sentiments in proximity to a Jewish house of worship could legitimately be subject to reasonable time, place and manner restrictions imposed by an injunction, a position which was supported by numerous Supreme Court precedents.

In addition to naming several of the Protesters as Defendants, the FAC included claims against the City of Ann Arbor ("City") for failing to enforce a sign ordinance which was unambiguous and which prohibited the placement of any signs in the public right-of-way, which the Protesters were using for that very purpose in violation of the ordinance. Plaintiffs maintained that the sign ordinance was content and viewpoint neutral, and therefore could be enforced without violating the Protesters' right of free speech.

The Protesters filed a motion to dismiss the lawsuit pursuant to Fed. R. Civ. P. 12(b)(1) and 12(b)(6). With respect to the 12(b)(1) motion, the Protesters claimed that the Plaintiffs did not have standing to sue. On August 19, 2020, the District Court entered an Order granting the motion to dismiss based on 12(b)(1). (R. 66) The court held that the Plaintiffs' extreme emotional distress was not a sufficiently

concrete injury to afford them standing to sue in the context of speech protected by the Free Speech provision of the First Amendment.

The District Court denied Plaintiffs' motion for reconsideration and motion to submit supplemental authority on September 3, 2020. (R. 69) Plaintiffs filed their Notice of Appeal on September 9, 2020. (R. 70)

After briefing and oral argument, the Sixth Circuit Court of Appeals issued its Opinion and Judgment on September 15, 2021, 14 F.4th 500 (6th Cir. 2021). The Court, in a 2-1 decision, reversed the court's ruling regarding standing and held that Plaintiffs' emotional distress sufficed to constitute an injury affording standing to sue. The Court proceeded to address the 12(b)(6) motion on the merits and held that the Protesters' conduct was protected by the Free Speech provision of the First Amendment, and accordingly held that Plaintiffs had failed to state a claim and dismissed the lawsuit. Petitions for *en banc* rehearing separately filed by Dr. Brysk and Mr. Gerber were denied by the Court on November 2, 2021.[1]

On October 13, 2021, the Protesters filed a renewed motion for attorney fees and sanctions in the District Court. (R. 84) On October 29, 2021, Dr. Brysk filed a motion to dismiss the renewed motion for attorney fees and sanctions on the ground that the motion was premature since the 6th Circuit had not yet issued a mandate

---

[1] After the Court dismissed the lawsuit, Mr. Gerber terminated Mr. Susselman as his attorney and retained new counsel. Mr. Susselman has continued to represent Dr. Brysk.

regarding the appeal. (R. 86)  On November 3, 2021, Dr. Brysk filed a Response to the Protesters' renewed motion for attorney fees and sanctions. (R. 89)  On November 12, 2021, the Sixth Circuit Court of Appeals issued its mandate regarding its dismissal of the appeal.

On January 19, 2022, Dr. Brysk filed a petition for a *writ of certiorari* in the United States Supreme Court requesting that the Sixth Circuit Court of Appeals' decision dismissing the lawsuit be reversed.  On March 21, 2022, the Supreme Court issued an Order denying the petition for a *writ of certiorari.*[2]

On January 25, 2022, the District Court issued its Order Granting In Part And Denying In Part Protestor Defendants' Motion For Attorney Fees And Sanctions. (R.103)  In its Order, the court held that the claims pled by the Plaintiffs in their FAC were frivolous and awarded the Protesters $158,721.75 in attorney fees, to be paid jointly and severally by the Plaintiffs and Marc Susselman. On that same date, the court issued its Judgment For Attorney Fees, R. 104.

Dr. Brysk filed the instant appeal on February 3, 2022. (R. 107)  On February 8, 2022, Brysk filed a Motion For Stay Of The District Court's Judgment Awarding Attorney Fees, followed by an amended motion on February 14, 2022, which she moved to supplement on April 12, 2022.  As of the current date, the Court has not

---

[2] Mr. Gerber's new attorney, Nathan Lewin, also filed a petition for *certiorari* in the Supreme Court, which is still pending.

issued a decision on the motion for a stay.[3]

## SUMMARY OF ARGUMENT

The District Court's Order awarding attorney fees to the Protesters pursuant to 42 U.S.C. §1988 on the basis that Plaintiffs' claims were frivolous is not supported by the record. Each issue which the court ruled was frivolous was supported by cogent arguments and applicable case law, arguments which the court did not address in its decision dismissing the lawsuit on the basis that the Plaintiffs did not have standing, a decision which the Court of Appeals reversed. The court's conclusion that the claims in question were frivolous contradicted the holding by the majority of the judges on the Court of Appeals panel that the claims were not frivolous. Moreover, the court's awarding of attorney fees to the Defendants was contrary to Supreme Court precedent which has held attorney fees should generally not be awarded to defendants in cases in which plaintiffs are suing to vindicate their rights under the federal civil rights laws. A claim is not frivolous merely because the plaintiff fails to prevail on the issue in question.

Even assuming the court was correct that several of the Plaintiffs' claims were frivolous, the court's ruling that the Protesters were entitled to recover attorney fees for

---

[3] Mr. Gerber filed an appeal on February 14, 2022. (R. 109) The Protesters filed a cross-appeal on February 22, 2022. (R. 112) Gerber filed a motion for a stay of the judgment with waiver of bond in the District Court on February 22, 2022. (R. 114) On April 11, 2022, the court issued an Order denying Gerber's motion for a stay without bond, and held its ruling in abeyance pending the outcome of Gerber's appeal. (R. 119)

the legal work which their attorneys devoted to the issue of standing, on which they did not prevail, was contrary to Supreme Court precedent holding that attorney fees may only be awarded for work relating to claims on which a party has prevailed. Therefore, the Protesters were not entitled to recover any attorney fees for the work which their attorneys expended on the issue of standing, which required that their attorneys differentiate in their time records how much time they expended on the issue of standing, versus on the claims which the court ruled were frivolous. The attorneys' block billing, however, made it impossible to make that determination, and consequently they were not entitled to recover any attorney fees.

## STANDARD OF REVIEW

A Circuit Court's standard of review of a district court's award of attorney fees was set forth in *Ne. Ohio Coal. for the Homeless v. Husted,* 831 F.3d 686 (6th Cir. 2016), as follows, *id.* at 702:

> This court reviews a district court's award of attorney fees and costs for an abuse of discretion. … "A district court abuses its discretion when it relies upon clearly erroneous findings of fact, applies the law improperly, or uses an erroneous legal standard." … Substantial deference "is appropriate in view of the district court's superior understanding of the litigation and the desirability of avoiding frequent appellate review of what essentially are factual matters." … But that discretion "is not unlimited." … "It is essential that the judge provide a reasonably specific explanation for all aspects of a fee determination. …" … In other words, the court must provide "a concise but clear explanation of its reasons for the fee award." … ( … "[a] district court should state with some particularity which of the claimed hours the court is rejecting, which it is accepting, and why") … .

(Citations omitted.)

"[T]o the extent that the district court's decision [regarding attorney fees] was premised on an error of law, we review its judgment *de novo*[.]" *Clajon Production Corp. v. Petera,* 70 F.3d 1566, 1581 (10th Cir. 1995).

## ARGUMENT

I.  **THE DISTRICT COURT'S ATTORNEY FEE ORDER APPLIED THE LAW IMPROPERLY AND DISREGARDED THE HOLDING OF THE CIRCUIT COURT MAJORITY THAT THE LEGAL CLAIMS PLED IN THE FIRST AMENDED COMPLAINT WERE NOT FRIVOLOUS.**

42 U.S.C. §1988(b) states in relevant part:

> In any action or proceeding to enforce a provision of sections 1981, 1981a, 1982, 1983, 1985, and 1986 of this title… the court, in its discretion, may allow the prevailing party, other than the United States, a reasonable attorney's fee as part of the costs … .

In *Riverside v. Rivera,* 477 U.S. 561 (1986), the Court observed that one of the main purposes behind allowing attorneys who prevail in pursuing civil rights lawsuits to recover attorney fees is to serve as an incentive to encourage attorneys to represent individuals who have a colorable argument that their civil/constitutional rights have been violated, and in so doing, attorneys act as private attorneys general vindicating the rights not only of their clients, but of the public. Quoting from the Congressional Record, the Court stated, *id.* at 575, "If the citizen does not have the resources, his day in court is denied him; the congressional policy which he seeks to assert and vindicate goes unvindicated; and the entire Nation, not just the individual citizen, suffers." 122 Cong. Rec. 33313 (1976) (remarks of Sen. Tunney).

While recognizing that a prevailing defendant may likewise, under certain

circumstances, be entitled to recover attorney fees under 42 U.S.C. §1988, those circumstances should be narrowly construed so as not to punish a losing plaintiff simply by virtue of having lost under a sincere and genuine belief that his/her civil rights had been violated. Such an application of the fee shifting statute would be counter-productive to one of its main objectives - to foster challenges to civil rights violations by not inhibiting plaintiffs from taking the risk of litigation out of concern that, if they lose, they will have to reimburse the defendant's attorney fees. In keeping with this rationale, in *Christiansburg Garment Co. v. Equal Employment Opportunity Comm'n,* 434 U.S. 412 (1978), the Court stated, *id.* at 421-22:

> [A] district court may in its discretion award attorney's fees to a prevailing defendant in a Title VII case upon a finding that the plaintiff's action was frivolous, unreasonable, or without foundation, even though not brought in subjective bad faith.

> In applying these criteria, it is important that a district court resist the understandable temptation to engage in *post hoc* reasoning by concluding that, because a plaintiff did not ultimately prevail, his action must have been unreasonable or without foundation. This kind of hindsight logic could discourage all but the most airtight claims, for seldom can a prospective plaintiff be sure of ultimate success. No matter how honest one's belief that he has been the victim of discrimination, no matter how meritorious one's claim may appear at the outset, the course of litigation is rarely predictable. Decisive facts may not emerge until discovery or trial. The law may change or clarify in the midst of litigation. **Even when the law or the facts appear questionable or unfavorable at the outset, a party may have an entirely reasonable ground for bringing suit.**

> **… Hence, a plaintiff should not be assessed his opponent's attorney's fees unless a court finds that his claim was frivolous, unreasonable, or groundless, or that the plaintiff continued to litigate after it clearly became so**. And, needless to say, if a plaintiff is found to have brought or

continued such a claim in *bad faith*, there will be an even stronger basis for charging him with the attorney's fees incurred by the defense. (Emphasis added; italics in the original; footnote omitted.)

The Court elaborated on its ruling in *Christiansburg* in *Hughes v. Rowe,* 449 U.S. 5 (1980), holding that the standard in *Christiansburg* applied to fee shifting under § 1988 as well, stating, *id.* at 15-16:

> Although arguably a different standard might be applied in a civil rights action under 42 U.S.C. §1983, we can perceive no reason for applying a less stringent standard. The plaintiff's action must be meritless in the sense that it is groundless or without foundation. **The fact that a plaintiff may ultimately lose his case is not in itself a sufficient justification for the assessment of fees.** …
>
> . . .
>
> **Allegations that, upon careful examination, prove legally insufficient to require a trial are not, for that reason alone, "groundless" or "without foundation" as required by *Christiansburg*.** (Emphasis added.)

While acknowledging the above precedents, and purporting to adhere to them, the District Court did the very opposite, ruling at \*7 that Plaintiffs' contention that the Protesters' conduct was not absolutely protected by the 1st Amendment was frivolous, relying in large part on Judge Clay's concurrence and partial dissent.  In ruling the 1st Amendment argument was frivolous, the court ignored the Plaintiffs' reliance on *Frisby v. Schultz,* 487 U.S. 474 (1988), in which the Supreme Court sustained the constitutionality of an ordinance which restricted the right to picket in proximity to a private home located in a residential neighborhood.  The Synagogue is likewise located in a residential neighborhood, and shares the character of a private home as a place of

refuge. The court ignored Plaintiffs' argument that the repeated picketing every Saturday morning for then 17 years made the Plaintiffs and their fellow congregants a captive audience, which the Court had held in *Lehman v. City of Shaker Heights,* 487 U.S. 298 (1974), modified the scope of freedom of speech – no one has the right to force others to hear or see their message against the intended target's will. The court disregarded Plaintiffs' distinguishing *Snyder v. Phelps,* 562 U.S. 443 (2011), and *Collin v. Smith,* 578 F.2d 1197 (7th Cir. 1978) (the Skokie neo-Nazi march case), on the basis that in both cases the respective court held that the plaintiffs did not constitute a captive audience, in *Snyder* because the signs were too far away from the funeral to be seen by the mourners; and in *Collin,* because the Holocaust survivors were not a captive audience since they could avoid seeing the neo-Nazi marchers by simply not going to downtown Skokie where they intended to march. Here, the Protesters, using their plainly visible anti-Semitic signs, were deliberately going where they knew they could find their Jewish targets; the Plaintiffs were not going out of their way to see the signs. The court ignored the factual question central to *Virginia v. Black,* 538 U.S. 343, 366 (2003), whether their repeated protests were conducted "with the purpose of threatening or intimidating" the congregants, particularly given their use of anti-Semitic slurs and their display of the Israeli flag with the Star of David defaced.

The court also disregarded Plaintiffs' reliance on *Ward v. Rock Against Racism,* 491 U.S. 781(1989), wherein the Court stated, *id.* at791: "Our cases make clear ... that

even in a public forum the government may impose reasonable restrictions of the time, place or manner of protected speech, provided the restrictions 'are justified without reference to the content of the regulated speech, that they are narrowly tailored to serve a significant governmental interest, and that they leave open ample alternative channels for communication of the information.'" The Protesters had ample other avenues in Ann Arbor where they could express their anti-Israel and anti-Semitic message without harassing Plaintiffs and their fellow congregants as they entered their house of worship. Moreover, the court disregarded the Plaintiffs' citation of *Madsen v. Women's Health Center, Inc.,* 512 U.S. 753 (1994), in which the Court held that restrictions placed on speech via an injunction is a constitutionally legitimate content neutral means to place narrowly tailored restrictions on intrusive speech in order to protect a countervailing significant government interest, in this case, to protect the right of Plaintiffs and their fellow congregants to exercise their 1st Amendment freedom of religion without being harassed or bullied. The fact that this Court rejected these arguments did not render them frivolous.[4]

---

[4] The fact that the Supreme Court denied Dr. Brysk's petition for *certiorari* was not a decision on the merits and does not constitute affirmance of this Court's decision rejecting Plaintiffs' 1st Amendment, or other arguments. *See Young v. Fire Ins. Exchange,* 338 U.S. 912, 919 (1950) ("Inasmuch …as all that a denial of a petition for a writ of certiorari means is that fewer than four members of the Court thought it should be granted, this Court has rigorously insisted that such a denial carries with it no implications whatever regarding the Court's views on the merits of a case which it has declined to review. The Court has said this again and again; again and again the admonition has to be repeated.")

During the oral argument, Judges Clay and Sutton emphasized that under 1st Amendment jurisprudence, the fact that speech offends the sensibilities of others is not a valid basis under the Constitution for censoring such speech. Judge Sutton proceeded to make the point that this was true even where the speech in question was being expressed in proximity to a house of worship, referring to the Jehovah Witnesses' cases of *Barnett* and *Gobitis*, which, he asserted, sustained the right of Jehovah Witnesses to proselytize in the vicinity of Catholic churches, regardless the offense it caused the parishioners. (Oral argument, April 27, 2021, at 9:47). But the cases which Judge Sutton was referring to, *Minersville District v. Gobitis,* 310 U.S. 586 (1940), *overturned, Board of Education v. Barnette,* 319 U.S. 624 (1943), involved the right of Jehovah's Witnesses children to refuse to recite the Pledge of Allegiance in the public schools they attended. The cases had nothing to do with the right of members of the Jehovah's Witnesses to proselytize in the vicinity of Catholic churches.

The case which involved the right of a Jehovah's Witness to make critical remarks about Catholicism was *Cantwell v. Connecticut,* 310 U.S. 296 (1941), in which two members of the Jehovah's Witnesses asked residents in a Catholic neighborhood to listen to phonograph records which criticized the Catholic religion. The events did not occur in proximity to a Catholic church, and did not involve a captive audience. The Supreme Court held that their prosecution for violating a state statute which criminalized committing a breach of the peace violated the plaintiffs' First Amendment

right, stating, *id.* at 309:

> **… Resort to epithets or personal abuse is not in any proper sense communication of information or opinion safeguarded by the Constitution, and its punishment as a criminal act would raise no question under that instrument.**
>
> We find in the instant case no assault or threatening of bodily harm, no truculent bearing, **no intentional discourtesy, no personal abuse.** On the contrary, we find **only an effort to persuade a willing listener** of what Cantwell, however misguided others may think him, conceived to be true religion. (Emphasis added.)

In the instant case, the Protesters, unlike the Jehovah's Witnesses in *Cantwell,* have never asked the congregants permission to place their anti-Semitic signs in front of their Synagogue. Contrasted with *Cantwell* are the facts in *Chaplinsky v. New Hampshire,* 315 U.S. 565 (1943), in which Chaplinsky, also a member of the Jehovah's Witnesses, was charged with violating a New Hampshire statute which forbade under penalty that any person shall address "any offensive, derisive or annoying word to any other person who is lawfully in any street or any other public place." The charge arose by virtue of Chaplinsky, in proximity to the Rochester City Hall, stating to the complainant: "You are a God damned racketeer and a damned Fascist and the whole government of Rochester are Fascists or agents of Fascists." The Court held Chaplinsky's speech constituted "fighting words" which were not entitled to 1st Amendment protection. The anti-Semitic slurs contained on the Protesters' signs are far more offensive than calling someone a "God damned racketeer and a damned Fascist." There is no indication in *Chaplinsky* that an actual breach of the peace

13

occurred, yet utterance of these words was not protected by the 1st Amendment and deemed sufficient to justify prosecution under a criminal statute. Why didn't the Protesters' anti-Semitic slurs constitute "fighting words" devoid of 1st Amendment protection? Plaintiffs' arguments that the Protesters' signs in front of a house of worship were not protected by the 1st Amendment were therefore not frivolous.[5]

The court's comments at *7 regarding the scope of the 1st Amendment and its application to speech addressing matters of public concern in a public forum have no bearing on the use of anti-Semitic hate speech in proximity to a Jewish house of worship. Antisemitic speech in proximity to a synagogue, and hate speech generally in proximity to any house of worship of any religion, does not constitute speech addressing matters of public concern. As the Supreme Court stated in *Cantwell, supra,* 310 U.S. at 309, *"*Resort to epithets or personal abuse is not in any proper sense communication of information or opinion safeguarded by the Constitution, and its punishment as a criminal act would  raise no question under that instrument."

---

[5] The case cited by the majority in *Gerber v. Herskovitz,* 14 F.4th 500 (2021), *id.* at 509, *Survivors Network of those Abused by Priests, Inc. v. Joyce,* 779 F.3d 785, 793 (8th Cir. 2015), was inapplicable because the 8th Circuit was addressing the constitutionality of a Missouri statute which made it a criminal offense to "[i]ntentionally and unreasonably disturb[], interrupt[], or disquiet[] any house of worship by using profane discourse, rude or indecent behavior, or making noise either within the house of worship or so near it as to disturb the order and solemnity of the worship service." *Id.* at 787. Plaintiffs had never argued that the Protesters should be criminally prosecuted. The *Survivors Network* decision had no bearing on whether an injunction placing reasonable time, place and manner restrictions on the conduct at issue would be unconstitutional.

The court proceeded to assert, at *8, that the majority in *Gerber* stated that Plaintiffs' claim based on 42 U.S.C. §1981 was frivolous. This assertion was not accurate. The majority did not state that **any** of the legal claims based on the federal civil rights statutes, 42 U.S.C. §§1981, 1982, 1983, or 1985(3), were frivolous. In fact, the majority stated the very opposite, 14 F.4th at 508:

> One could colorably argue that signs that say "Jewish Power Corrupts" and "No More Holocaust Movies" directly outside a synagogue attended by holocaust survivors and timed to coincide with their service are more directed at the private congregants than designed to speak out about matters of public concern. The claims require a context-driven examination of complex constitutional doctrine. That doctrine is not always intuitive, as shown by the reality that the captive audience doctrine applies to civil regulation of protests outside homes and abortion clinics but not court-ordered injunctions outside houses of worship. Plaintiffs' **claims** may be wrong and ultimately unsuccessful, but the fourteen pages that the concurrence devotes to analyzing the constitutional issues **belie the conclusion** that **they are frivolous**.
>
> III.
>
> On the merits, the congregants' federal **claims** fall into four brackets: substantive due process, religious liberty, **general civil rights**, and a constitutional right to petition the government. (Emphasis added.)

In making this ruling, the Court used the word "claims," not "contentions" or "positions." The word "claims" referred to the legal claims which the Plaintiffs had pled in their FAC, not to the "contention" or "position" that they had standing to sue, or that the Protesters' conduct was not protected by the 1st Amendment. The fact that the word "claims" referred to all of the legal claims which the Plaintiffs had pled in the FAC was reinforced in the next paragraph where the Court repeated the use of

the word "claims," stating, "On the merits, the congregants' federal claims fall int

four buckets: substantive due process, religious liberty, **general civil rights**, and a

constitutional right to petition the government." (Emphasis added.) The reference to

"general civil rights" referred to the claims which the Plaintiffs had pled charging the

Protesters with violating 42 U.S.C. §§1981, 1982, 1983, and 1985(3).

While the court cited *Christiansburg,* it disregarded its holding that

unsuccessful plaintiffs should not be penalized by awarding attorney fees to

prevailing defendants unless the claims pursued by a plaintiff were frivolous and

wholly without merit. In an effort to avoid the ruling by the majority that the

Plaintiffs' claims were not frivolous, the court stated at *6-7:

> Plaintiffs say their claims had merit and were not frivolous, unreasonable, or groundless. To support this argument, they rely on the following statement by the majority opinion: "Plaintiffs' claims may be wrong and ultimately unsuccessful, but the fourteen pages that the concurrence devotes to analyzing the constitutional issues belie the conclusion that they are frivolous." *Gerber.* 14 F.4th at 408. Plaintiffs say this statement by the majority precludes the Protestor Defendants from recovering attorney fees or costs under § 1988(b).

> The Court disagrees. In large part, the 14 pages the concurrence spent discussing the constitutional issues concerned whether the Plaintiffs established standing – not simply whether Plaintiffs stated plausible claims.

> Aside from standing, it was clear that Plaintiffs' claims against Protestor Defendants were groundless. Plaintiffs sought to restrict the Protestor Defendants from protesting on a public sidewalk regarding matters of public concern. However, a public sidewalk is a quintessential public forum, and case law is clear that speech at a public forum on a matter of public concern is entitled to "special protection" under the First Amendment – even if it is offensive or upsetting. *See*

*Gerber,* 14 F.4th at 508-09.

The court's take on what the majority held was clearly erroneous. The majority's holding that the claims were not frivolous was not limited to the issue of standing, since this issue did not constitute a "claim," per se. The court, nonetheless, proceeded to hold that each of the civil rights claims invoking 42 U.S.C. §§1981, 1982, 1983 and 1985(3) was frivolous. In so holding, the court ignored the fact that the holding of the majority decision expressly stated Plaintiffs' federal civil rights claims **were not frivolous,** thus precluding an award of attorney fees to the Defendants under *Christianburg* and *Hughes, supra.* In so ruling, the majority were not referring to Plaintiffs' contentions regarding standing or the scope of the 1st Amendment's protection, which were **contentions**, not **claims**. The court in fact acknowledged the difference when addressing Plaintiffs' argument that the Protesters were not entitled to recover attorney fees for any legal work which they devoted to the issue of standing, since they failed to prevail on this issue. The court thus stated, at *14: "Plaintiffs mischaracterize the law. Protestor Defendants' argument that Plaintiffs lacked standing was not a 'claim'; it was a contention." Therefore, the majority's reference to "claims" cannot have been referring to Plaintiffs' success on the issue of standing.

The court's ruling that the Plaintiffs' claims under 42 U.S.C. §§1981, 1982, 1983 and 1985(3) were frivolous, entitling an award of attorney fees to the Protestor Defendants, directly contradicted the majority decision's holding that none of these

claims was frivolous.  The majority decision in this regard was the law of the case.  In

*U.S. v. Moored,* 38 F.3d 1419 (6th Cir. 1994), the Court stated, *id.* at 1421:

> The law of the case doctrine and the mandate rule generally preclude a lower court from reconsidering an issue expressly or impliedly decided by a superior court. However, these principles are not without exception. "Even where, as here, an appellate court's mandate does not contemplate resurrecting an issue on remand, the trial court may still possess some limited discretion to reopen the issue in very special situations." .. [T]he law of the case doctrine dictates that issues, once decided, should be reopened only in limited circumstances, e.g., where there is "substantially different evidence raised on subsequent trial; a subsequent contrary view of the law by the controlling authority; or a clearly erroneous decision which would work a manifest  injustice."…(Citations omitted.)

None of these exceptions to the application of the law of the case applied here.

*See Mason v. Mitchell,* 729 F.3d 545, 550 (6th Cir. 2013) ("The trial court must

implement both the letter and the spirit of the mandate, taking into account the

appellate court's opinion and the circumstances it embraces."); *In re Dwayne*

*Miedzianowski, Corp.,* 735 F.3d 383, 384 (6th Cir. 2013) ("Where our circuit has

answered the question, the district court is bound by our published authority. And

so are we.") The District Court was bound by the decision of the majority that

Plaintiffs' legal claims were not frivolous.

While the Protesters were the prevailing party on the issue of whether their

conduct was protected by the free speech provision of the 1st Amendment, and they

prevailed on the claims under 42 U.S.C. §§1981, 1982, 1983, and 1985(3), the

majority decision held that the arguments and claims which the Plaintiffs made with

respect to these issues were not frivolous, which entails they were also not unreasonable or groundless. Consequently, the Protesters are precluded from recovering any attorney fees or costs related to the expenditure of time devoted to the issues on which they prevailed, the application of the 1st Amendment's free speech provision and the federal civil rights statutes to their conduct. *See Jones v. Continental Corp.,* 789 F.2d 1225 (6th Cir. 1986) (reversing an award of attorney fees to defendant, stating, *id.* at 1233, "[The evidence] fall[s] short of a finding that Jones's termination claim was frivolous, unreasonable or groundless, and indeed, the existing record is inadequate to support such a finding."); *Smith v. Smythe-Cramer Co.,* 754 F.2d 180 (6th Cir. 1985) (reversing an award of attorney fees to the defendants, stating, *id.* at 185, "We conclude that the district court abused its discretion by awarding attorneys fees to defendants. … Plaintiffs have presented an adequate basis for their suit to avoid the conclusion that it is frivolous, unreasonable, or without foundation."); *Tartar v. Raybuck,* 742 F.2d 977 (6th Cir. 1984) (reversing an award of attorney fees to the defendants, stating, *id.* at 988, "That the district court or this court ultimately declined to adopt the positions urged by plaintiffs on these questions is not tantamount to concluding defendants are entitled to an attorneys fees award under section 1988."); *U.S. v. State of Mississippi,* 921 F.2d 604 (5th Cir. 1991) (affirming a denial of attorney fees to defendant, stating, *id.* at 609, "We review frivolity by asking whether the case was so lacking in merit that it was groundless,

rather than whether the claim was ultimately successful."); *Mitchell v. City of Moore, Oklahoma,* 218 F.3d 1190 (10th Cir. 2000) (affirming a district court's denial of awarding attorney fees to the defendant, stating, *id.* at 1203, the standard "is difficult to meet, to the point that rarely will a case be sufficiently frivolous to justify imposing attorney fees on the plaintiff.").

The District Court, however, in the face of the majority's holding that none of the claims were frivolous, proceeded to hold that each was frivolous, starting with 42 U.S.C. §1981, stating, at *8, that Plaintiffs had "failed to allege that they lost out on the benefit of any 'law or proceeding.'" The court ignored the fact that Plaintiffs had made the following argument in Plaintiffs' Response to the Protester Defendants' Motion To Dismiss, R. 54, Page ID #1738: Section 1981 applies to discriminatory acts by private citizens based on race and ethnicity of others, without state action.[6] *Chapman v. Higbee Co.,* 319 F.3d 825 (6th Cir. 2003), *cert. denied,* 542 U.S. 945 (2004). A violation of § 1981 can be based on the violation of another law, including a state law, intended to protect the Plaintiff's personal security. The Protesters' repetitive picketing in front of the same location is a form of stalking. M.C.L. §750.411h defines "stalking" as "a willful course of conduct involving repeated or continuing **harassment** of another individual that would cause a reasonable person to feel terrorized, frightened,

---

[6] Since 42 U.S.C. §§1981, 1982 and 1985(3) apply to discriminatory conduct by private citizens based on race or ethnicity, they apply with equal force to the anti-Semitic signs as well as the anti-Israeli signs, since they are targeting the congregants of the Synagogue based on their race and ethnicity.

**intimidated**, threatened, **harassed**, or molested and that actually causes the victim to feel terrorized, frightened, **intimidated**, threatened, **harassed**, or molested." (Emphasis added.) The statute prohibits "unconsented contact," which includes, "Following or appearing within the sight of that individual." The § 1981 claim was therefore not frivolous.

The court erroneously held that the § 1982 claim was frivolous by ignoring the argument also set forth in Plaintiffs' Response to the Protesters' motion to dismiss. R. 54, Page ID #1740, that in evaluating a §1982 claim, the courts apply the same standard of proof under the Federal Housing Act, 42 U.S.C. §3601 *et seq.*, and 42 U.S.C. §1981 and § 1982. *Reeves v. Rose,* 108 F. Supp.2d 720 (E.D. Mich. 2000). *Reeves* held that under §§ 1981 and 1982, the courts apply the burden shifting test in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792 (1973). *See Daniels v. Board of Education of the Ravenna City School District,* 805 F.2d 203, 207 (6th Cir. 1986). Under that test*,* any conduct displaying discriminatory bias, even speech, for example, sexual harassing speech, will suffice to make a *prima facie* case. The Protesters targeted the Synagogue for their harassing and anti-Semitic speech because the congregants are Jewish. This satisfied the *prima facie* case. The Protesters would likely claim as their legitimate, nondiscriminatory reason that they were expressing their disagreement with the oppressive policies of Israel towards the Palestinians. This explanation would be a pretext, since if they really wanted to convey this message effectively, they would not

have limited their venue to a single location – a Jewish house of worship – week after week, for 17 years. That they have primarily picketed the Synagogue, demonstrates "a discriminatory reason more likely motivate[s]" them. *Daniels, supra.  See Wells v. Rhodes,* 928 F. Supp.2d 920 (S.D. Ohio 2013) (placing a burning cross on the leased property of an African-American family, without causing any physical injury to the family members or to the property, violated both §1982 and §1985(3)).  Why wouldn't placing the flag of Israel, with the Star of David defaced, in front of a Jewish house of worship warrant the same legal consequence? The §1982 claim was therefore not frivolous, notwithstanding the Sixth Circuit dismissed it.

The court likewise held the §1983 claim was frivolous, here again ignoring the argument set forth in R. 54, Page ID #1741-1743, that the City's repeated failure over a period of 17 years to enforce its content and viewpoint neutral sign ordinance prohibiting the placement of the Protesters' signs in the public -right-of-way could be enforced without violating the 1st Amendment. *See R.A.V. v. St. Paul,* 505 U.S. 377 (1992); *Jobe v. City of Catlettsburg,* 409 F.3d 261 (6th Cir. 2005).  The City's failure to order the Protesters to remove the signs, thereby interfering with the freedom of worship of the Plaintiffs and their fellow congregants, rendered the Protesters state actors under the *nexus/*entwinement test adopted in *Burton v. Wilmington Pkg. Authority,* 365 U.S. 715 (1961).

*Hashem-Younes v. Danou Enterprises, Inc.,* No. 06-CV-15469, 2008 WL 786759

(E.D. Mich. Mar. 20, 2008), cited by the court at *9, is distinguishable. In *Hashem-Younes,* a former employee of a business which provided Arabic translation services sued her employer claiming her termination was unlawfully based on her being female, pregnant, Lebanese and Muslim. She included a claim under §1983, asserting that her employer was a state actor. The court rejected the claim as frivolous and assessed attorney fees because there was no evidence to support the claim the employer was acting under color of law. There was no evidence, for example, that her employer had received any government grants. The evidence here of entwinement between the Protesters and the City due to its failure to enforce its sign ordinance which prohibited the manner in which the Protesters were using their signs every week-end over a period of 17 years – a total of 884 consecutive weeks – was more substantial evidence that the Protesters were acting under color of law by virtue of the City's acquiescence in their repeated violation of the sign ordinance than that in *Hashem-Younes.* The §1983 claim in the instant case was consequently not frivolous, although rejected by this Court.

The court's ruling that the §1985(3) claim was groundless because there was no evidence of state action is erroneous on two grounds. First, a §1985(3) claim applies to private citizens, even without state action, if their conduct is motivated by a class-based animus relating to race or religion. *See Griffin v. Breckenridge,* 403 U.S. 88 (1971); *Bray v. Alexandria Clinic,* 506 U.S. 263 (1993)*; Brokaw v. Mercer County,* 235 F.3d 1000 (7th Cir. 2000); *Jews for Jesus, Inc. v. Jewish Community Relations Council of*

*New York, Inc.,* 968 F.2d 286 (2d Cir. 1992); *Wells v. Rhodes, supra*. The Supreme Court has held that Jews qualify as a race for purposes of the federal civil rights statutes. *Shaare Tefila Congregation v. Cobb,* 481 U.S. 615 (1987). Second, **there was evidence of state action** based on the City's repeated failure over a period of 17 years to enforce its sign ordinance. The §1985(3) claim was not frivolous.

The court's ruling that the civil conspiracy claims under §§1982, 1983, and 1985(3) were frivolous is also erroneous. Since §§1982 and 1985(3) apply to private citizens, and therefore applied to the Protesters without state action, it is clear the Protesters were engaged in concerted action constituting a conspiracy, otherwise how did they manage to meet at the same place every Saturday morning, at the same time, bringing the same signs every week-end?

Regarding the §1983 conspiracy claim, Plaintiffs provided the court with video evidence of Ann Arbor police conversing with the Protesters and agreeing with them that their use of their signs did not violate the City Code and they would not be issued a citation, despite the fact that signs could be seen in the video placed in the public right-of-way in clear violation of the sign ordinance. (R. 50, Pager ID #1333, note 4) There was further evidence of the police being present on numerous week-ends without enforcing the sign ordinance, even with over twenty signs being placed in the public right-of-way in violation of the sign ordinance. "[W]e have recognized that ... 'conspiracies are by their very nature secretive operations,' and may have to be

proven by circumstantial, rather than direct, evidence." *Pangburn v. Culbertson,* 200 F.3d 65, 73 (2d Cir. 1999). "Circumstantial evidence may provide adequate proof of the existence of such a conspiracy." *Haffner v. Brown,* 983 F.2d 570, 577 (4th Cir. 1992). "The dates on which the particular defendants joined the conspiracy are not alleged, but that is not the kind of information that a plaintiff can be expected to have when she files her complaint." *Loubser v. Thacker,* 440 F.3d 439, 443 (7th Cir. 2006). There was sufficient empirical evidence of an implicit agreement between the City and the Protesters that they could do as they pleased and continue to harass and insult Plaintiffs and their fellow congregants with impunity. The civil conspiracy claims accordingly were not frivolous.

The District Court, while acknowledging that under the holdings of *Christiansburg* and *Hughes, supra,* a court should be circumspect about awarding attorney fees to a prevailing defendant, especially in the area of civil rights litigation, the court nonetheless stated, at *10, "However, concluding that Plaintiffs' claims were meritless and failed under Rule 12(b)(6) required little examination." In support of the court's conclusion, it cited *Garner v. Cuyahoga Cty. Juv. Ct.,* 554 F.3d 624 (6th Cir. 2009), in which the Court affirmed the trial court's award of attorney fees to be paid jointly and severally by some, but not all, of the African-American plaintiffs who had sued their employer, the Cuyahoga County Juvenile Court (CCJC), alleging they had been discriminated against based on their race. The trial court had dismissed

the claims, after the conclusion of discovery, pursuant to a motion for summary judgment (not for failure to state a claim under Rule 12 (b)(6)), following a thorough review of the factual evidence in the record, and a determination that **on the facts** there was insufficient evidence of any discrimination based on race. The Circuit Court noted, for example, *id.* at 638, that a data analysis of the CCJC's hiring and promotion practices revealed that "93.8% of African-American employees received a position upgrade, while only 70.1% of Caucasians did." The Court also noted the plaintiffs' counsel had failed to retain an expert to evaluate or contest the CCJC's data analysis. The Court held that because the factual record failed to provide any evidence of discrimination based on race, the claims were frivolous, and the plaintiffs in question and their attorney therefore deserved to be assessed attorney fees, jointly and severally. The Court, however, reversed the trial court's award of $660,103.47, and remanded the case to the trial court for a hearing to determine the point in time during the litigation that the claims had become frivolous.

In the instant lawsuit, however, there were no substantive facts in dispute: there was no dispute regarding what messages were on the signs used by the Protesters, and that several of them included anti-Semitic slurs; there was no dispute that Protesters had been picketing Beth Israel Synagogue every Saturday morning for 17 years; there was no dispute that the City had in place a sign ordinance which prohibited placing any signs in the public right-of-way, a claim which in fact the City

never challenged, nor had it challenged Plaintiffs' position that the sign ordinance was content and viewpoint neutral, and therefore, under numerous Supreme Court and Circuit Court precedents cited in Plaintiffs' briefs, could be enforced without violating the Protesters' right of free speech; there was no dispute that the City had never enforced the sign ordinance against the Protesters, and there was no dispute that on numerous occasions police were present when there were signs positioned in the public right-of-way in clear violation of the sign ordinance. Moreover, unlike the facts in *Garner,* Plaintiffs had retained an expert, Prof. Kenneth Waltzer, who was the Director of the Jewish Studies Program at Michigan State University for ten years and taught a course titled "Antisemitism and the Jews" for forty years. He submitted an affidavit which the court had available in the record to review. (R. 22, Page ID #554-582) Regarding the signs used by the Protesters and their connection to Antisemitism, Prof. Waltzer stated, in relevant part:

> Kenneth Waltzer, being first duly sworn, deposes and states as follows:
>
> 1.     I have a Ph.D. in history from Harvard University, where I was a Graduate Prize Fellow.  I am Professor Emeritus of History at Michigan State University and served variously at MSU as interim dean or associate dean of James Madison College, MSU's highly reputed residential college in public affairs, from 1989 to 1996; as director of the University's general education program in the arts and humanities, 1997 to 2004; and as director of MSU's Jewish Studies Program, from 2004 to 2014.  (A copy of my *Curriculum Vitae* is attached to my Affidavit.)
> …
> 4.     Antisemitism is an animus or a hatred based on a negative portrait of the Jew as an extraordinarily malevolent, powerful, and

dangerous being. The Jew represents evil and a threat and is viewed as the main obstacle to improving or perfecting the world. Since the beginning of the modern era, antisemitism is also a delusive, pseudo-explanatory political theory and form of group defamation designed to explain why national or world politics are moving along the negative path they are on. It is the Jews who are the cause and powerful force that are to blame, manipulating states, controlling financial markets, media, and other communication institutions, and influencing decision-makers.

5.      Antisemitism is a protean phenomenon, radically changeable, malleable, living and changing in history rather than existing in fixed form outside history eternally.  The animus or hatred can intensify or diminish in intensity, rising or falling, and the portrait of the Jew can alter sharply in its content – shifting from religious (a people truant from its role as the true Israel), to racial (a people different and threatening biologically), to cultural or political (a subversive, culture destroying people), to moral. Throughout Europe, legislators and leaders openly debated whether Jews were moral enough beings to merit inclusion and access to equal citizenship in states that formed in the 19th and 20th centuries.  Antisemites opposed any such inclusion, and when Jews were emancipated and included in these states, they organized antisemitic movements and parties against the political orders that could contemplate Jewish inclusion.

. . .

10.    At bottom, antisemitism in all its varied guises rests on the belief that the world would be improved if Jews were superseded or replaced, or if their influence were limited, blunted, or eliminated.  With the new antisemitism on the left, particularly, American Jews or British, French, and Belgian Jews are imagined as linked with evil and as guilty and appropriate targets of defamation or worse because they support an evil Jewish state.   They are fair game for proscription, calumny, and insult because they align themselves with evil.

. . .

16.    One way to understand the content and tenor of the actual protests mounted weekly near Beth Israel is to read the signs and review pictures of the signs held by protesters.  The signs read "Jewish Power," "Resist Jewish Power," and "Jewish Power Corrupts," reiterating the slanderous Jewish stereotypes cited above.  They also read "No More Wars for Israel," and "Israel's Hold on Congress Must End."  Others call out to "Boycott Israel," and declare "Israel: No Right to Exist."  One opines "The Former Victims are now the Victimizers," subtly comparing Israeli and

Nazis. Another sign offers the same claim with less subtlety: "Israelis are Nazis." Yet another poster states that "Zionism is Racism," echoing the calumny pushed by the former Soviet Union and its allies and adopted by the United Nations in 1975 but since then rejected. And another sign insists that "U.S. Tax Dollars Should Not Support Genocide." Interestingly, a group whose members wonder about the veracity of the Nazi genocide hesitates not at all in erroneously calling Israeli policy toward Palestinians genocidal.

17.     The signs promote age-old antisemitic tropes about purported Jewish outsized influence in world finance and controlling power in international and national political affairs. They imply that the all-powerful Jewish lobby is lodged in the synagogue and that the synagogue acts as part of the lobby, supporting an alleged nationalist political agenda. They repeat the general statement that the United States Congress is Israeli-held territory and call for releasing Israel's hold on Congress. They suggest that members of the congregation who support Israel are pursuing a path of double loyalty. A sign emphasizes "America First, not Israel First." They also promote factually erroneous and inflammatory statements related to the Israeli-Palestinian conflict, the United States record in the Middle East, Israel's relation to and responsibility for American military interventions in the Middle East and the place of the Israeli lobby in American policy making. Israel bears no responsibility whatsoever for recent contemporary American efforts mounted in Iraq or Afghanistan or in Syria.

Unlike *Garner,* here there was no insufficiency of evidence rendering the claims frivolous. The facts were not in dispute. The issue under review was a legal issue regarding the applicability of the legal precedents relating to the scope of freedom of speech in a unique context, where some of the speech involved hate speech in proximity to a house of worship, implicating the 1st Amendment right of freedom of religion. Plaintiffs maintained that the fact that some of the speech related to an issue of public concern – the Israeli-Palestinian conflict – did not clothe the anti-Semitic hate speech on several of the signs with the same mantle of 1st Amendment protection which

precluded the imposition of an injunction placing reasonable time, place and manner restrictions on the Protesters' conduct, considering the assertion in *Cantwell,* *"*that the resort to epithets or personal abuse is not in any proper sense communication"; considering the holding in *Chaplinsky* that the use of fighting words such as calling someone a "damned Fascist" is not protected by the 1st Amendment; and considering the holding in *Beauharnais v. Illinois,* 343 U.S. 250 (1954), that prosecuting someone for violating a statute which criminalized malicious libel by distributing literature which "exposes the citizens of any race, color, creed or religion to contempt, derision, or obloquy" is not unconstitutional.[7]

This Court rejected Plaintiffs' claims and held otherwise. However, while the principle that the 1st Amendment affords protection even to "the thought that we hate," *Girouard v. United States,* 328 U.S. 61, 68 (1946), quoting from *United States v. Schwimmer,* 279 U.S. 644, 655 (1929) (J. Holmes, dissenting), entails that we must tolerate hate speech, it does not entail that we must reward and champion hate speech by requiring that its purveyors' attorney fees be paid by those who seek to limit - not entirely expunge, but limit - the contexts in which it may be purveyed, by requiring that

---

[7] It should be made clear that this is not equivalent to allowing the "heckler's veto" to suppress the freedom of speech of those whose speech we find offensive, as was held in *Bible Believers v. Wayne County,* 805 F.3d 228 (6th Cir. 2015). There is no evidence that either of the Plaintiffs, or any of their fellow congregants, confronted the Protesters or heckled them in an effort to get the police involved in order to quell a disruption and disperse the Protesters. Going to court in order to exercise one's right under the 1st Amendment to petition the government for redress of one's grievances is not equivalent to the heckler's veto.

an 87 year-old Holocaust survivor compensate a group of neo-Nazi anti-Semites their attorney fees. And given the centuries of Antisemitism in which the use of such hate speech - speech claiming that "Jewish Power Corrupts" and demanding "No More Holocaust Movies," because we have heard enough of Jewish whining - has resulted in the torture and murder of millions of Jews, to hold that Plaintiffs' legal claims filed in court in an effort to limit the use of such hate speech in proximity to their house of worship as they enter their sanctuary in order to exercise their freedom of religion, were "frivolous" is a reprehensible affront and defilement of the Jewish people, and has the appearance of being anti-Semitic in light of the court's disregard of the Supreme Court precedents cited above, and its contradiction of the majority's holding that the claims were not frivolous.[8]

An attorney who expresses an opinion based on the record that a judge appears to be biased is not sanctionable and is protected by the free speech provision of the 1st Amendment. "A statement of opinion based on fully disclosed facts can be punished only if the stated facts are themselves false and demeaning." *Standing Committee v. Yagman,* 55 F.3d 1430, 1439 (9th Cir. 1995), reversing the suspension of an attorney for asserting that a federal judge was anti-Semitic. *See also Berry v. Schmitt,* 638 F.3d 290

---

[8] "The legacy of the Holocaust must always remind us that silence in the face of such bigotry is complicity. … Today and every day, we stand against antisemitism and all other forms of hate and continue our work to ensure that everyone can live in a world that safeguards the fundamental human dignity of all people." President Biden, April 22, 2022 (A Proclamation on Days of Remembrance Of Victims Of the Holocaust, 2022) (Copy attached as Exhibit 1.)

(6th Cir. 2012). As Justice Black stated in *Bridges v. California,* 314 U.S. 252 (1941), *id.* at 271, "[A]n enforced silence, however limited, solely in the name of preserving the dignity of the bench, would probably engender resentment, suspicion, and contempt much more than it would enhance respect." The court's Order awarding the Protesters attorney fees capped a series of questionable rulings which were consistently adverse to the Plaintiffs: **(1)** The court's dismissal of the lawsuit on the purported ground that the Plaintiffs' emotional distress caused by the presence of the anti-Semitic signs in proximity to their Synagogue on the basis that their emotional distress did not constitute a "concrete injury," a ruling which the panel majority summarily rejected, stating, 14 F. 4th at 506, "All in all, the congregants have standing to sue because they have credibly pleaded an injury – extreme emotional distress – that has stamped a plaintiff's ticket into court for centuries." **(2)** The court's assertion that the emotional distress was not sufficiently concrete despite the filing of five affidavits attesting to the intensity of the Plaintiffs' emotional distress and that of other congregants. (R. 22, Page ID #584-598; #611-620); **(3)** The court's assertion in its Order granting Defendants' motion to dismiss, R. 66, Page ID #1905, "Indeed, the First Amendment **more than** protects the expressions by Defendants of what Plaintiffs describe as 'anti-Israeli, anti-Zionist, an[d] antisemitic.'" (Emphasis added.) Why did the 1st Amendment "more than protect" this particular speech? What made this particular speech more worthy of 1st Amendment protection than other speech expressed in a public forum? Because some of it was anti-

Semitic? Because some of it was condemning Israel and Zionism? Was the court expressing an opinion about the merits of the speech based on the judge's personal political opinion? This would clearly be inappropriate, as inappropriate for a judge evaluating the free speech right of anti-abortion protesters in the vicinity of an abortion clinic to reject a request for a preliminary injunction on the basis that the speech of the anti-abortionists was "more than protected" by the 1st Amendment. **(4)** The court's denial (R. 58) of Plaintiffs' request to file a motion for a preliminary injunction (R. 55) placing reasonable time, place and manner restrictions on the Protesters' picketing. **(5)** The court's denial (R. 63) of Plaintiffs' request for permission to file a motion for partial summary judgment against the City (R. 60), arguing that since the City's sign ordinance was content and viewpoint neutral, it could be enforced without violating the Protesters' right of free speech, an issue which to date has never been addressed. **(6)** These rulings, taken together with the court's Order awarding the Protesters attorney fees, including attorney fees for time devoted to arguing the issue of standing, **on which they did not prevail** – a ruling which flies in the face of Supreme Court precedent and the majority's holding that none of the Plaintiffs' claims were frivolous – have the distinct appearance of being biased and anti-Semitic. While an allegation that a judge is biased generally must be based on extrajudicial sources, an exception is where non-extrajudicial sources indicate "pervasive bias that demonstrates 'a deep-seated favoritism or antagonism that would make fair judgment impossible.' *Liteky v. U.S.,* 510 U.S. 540, 555 (1994)."

*Miller v. Commodities Futures Trading Comm'n,* 197 F.3d 1227, 1235 (9th Cir. 1999). *See also McWhorter v. City of Birmingham,* 906 F.2d 674, 678 (11th Cir. 1990). The appearance of Antisemitism in the judiciary doth never prosper. The reason? For if it prosper, none dare call it Antisemitism.

In his concurrence, Judge Clay took the Appellants' attorney to task for what he regarded as a claim that the attorney was accusing the District Court judge of racial bias based on her failure to cite *Wells v. Rhodes, supra,* in her decision dismissing the lawsuit. 14 F.4[th] at 519, note 4. Judge Clay cited *Howard v. Secretary Of Health Human Services,* 932 F.2d 505 (6th Cir. 1991), as an admonition that making a charge of racial bias unsupported in the record would not be well received. In *Howard,* the attorney had failed to file timely objections to the magistrate's recommendation in order to preserve his appeal. The magistrate denied his client's application for SSD benefits based on his conclusion that her claim of severe pain was not supported by the medical evidence. On appeal, the attorney claimed that the ALJ in question "consistently denies the benefit applications of minority claimants." 932 F.2d at 510, note 2. The Court took umbrage at this assertion, because it was "completely unsupported in the record." In order for the attorney's accusation to have had support in the record, he would have had to produce data reflecting the ALJ's decisions and demonstrate that there was a statistically significant difference between the number of minority candidates he rejected for SSD benefits, versus the number of Caucasians whose applications he granted. The attorney

had failed to do so, and hence the Court's rebuke.

Here, the District Court held that the Plaintiffs' legal claims were frivolous, contrary to the majority's holding that they were not, and contrary to the legal arguments which Plaintiffs had provided in support of each of the claims, arguments which the court did not address. Instead, the court dismissed the lawsuit because the emotional distress which the Jewish Plaintiffs attested to the court claimed was not sufficiently "concrete" to afford standing, a position which the majority summarily rejected. The court's decision to grant the Protesters attorney fees, in conjunction with the other rulings cited above, provides support in the record that the court's rulings have the distinct appearance of being anti-Semitic. Such bias violates Canon 2(A) of the Code of Conduct for United States Judges: "**Canon 2: A Judge Should Avoid Impropriety and the Appearance of Impropriety in all Activities** (A) *Respect for Law.* A judge should respect and comply with the law and should act at all times in a manner that promotes public confidence in the integrity and impartiality of the judiciary."[9] Unlike the attorney in *Howard,* the undersigned is making a claim of the appearance of bias

---

[9] As Justice Marshall, recognizing the fallibility even of judges, stated, dissenting in *Hobby v. United States,* 468 U.S. 339, 353 (1984), "A judge is supposed to be the very embodiment of evenhanded justice. Society reveals its confidence that a judge will attend to his official duties without illicit regard for race or sex or other irrelevant characteristics by entrusting to him wide discretionary authority. … [I]t is unlikely that a judge who engages in racist and sexist appointment practices will confine his prejudicial attitudes and actions to the area of foreman selections. More likely is that the presence of unconstitutional discrimination in that area is but a portion of a widespread region of tainted decisionmaking."

that **is** supported by pervasive evidence in the record.  *Justice, justice thou shalt pursue.*

Deuteronomy 16:20.  "Here I stand; I can do no other."  Martin Luther

The District Court's conclusion that the claims pled by Plaintiffs in the FAC were frivolous is contrary to settled law; contrary to the holding of this Court's majority that none of the claims were frivolous; and contrary to the cogent arguments which Plaintiffs made in their briefs, but which the court ignored.  Consequently, the court abused its discretion in awarding attorney fees in any amount to the Protesters to be paid jointly and severally by the Plaintiffs and their current and former attorney, let alone in the outrageous amount of $158,721.75.  The decision must be reversed.

## II.    EVEN IF PLAINTIFFS' CLAIMS WERE FRIVOLOUS, THE PROTESTERS ARE ENTITLED TO RECOVER ATTORNEY FEES FOR DEFENDING AGAINST THOSE CLAIMS ONLY, NOT FOR ANY TIME DEVOTED TO THE STANDING ISSUE.

### A.    The District Court Misapplied The Holding Of *Fox v. Vice,* 563 U.S. 826 (2011).

In *Hensley v. Eckerhart,* 461 U.S. 424 (1983), the Supreme Court provided guidance regarding how the fee shifting formula should be applied in cases in which a plaintiff is only partially successful and is the prevailing party with respect to fewer than all of the claims the plaintiff has pled, stating, *id.* 434-36:

> In some cases a plaintiff may present in one lawsuit distinctly different claims for relief that are based on different facts and legal theories. In such a suit, even where the claims are brought against the same defendants – often an institution and its officers, as in this case – counsel's work on one claim will be unrelated to his work on another claim. Accordingly, work on an unsuccessful claim cannot be deemed to have been "expended in

pursuit of the ultimate result achieved." The congressional intent to limit awards to prevailing parties requires that these unrelated claims be treated as if they had been raised in separate lawsuits, and therefore no fee may be awarded for services on the unsuccessful claim.

. . .

If, on the other hand, a plaintiff has achieved only partial or limited success, the product of hours reasonably expended on the litigation as a whole times a reasonable hourly rate may be an excessive amount. This will be true even where the plaintiff's claims were interrelated, nonfrivolous, and raised in good faith. Congress has not authorized an award of fees whenever it was reasonable for a plaintiff to bring a lawsuit or whenever conscientious counsel tried the case with devotion and skill. Again, **the most critical factor is the degree of success obtained**.

Application of this principle is particularly important in complex civil rights litigation involving numerous challenges to institutional practices or conditions. This type of litigation is lengthy and demands many hours of lawyers' services. Although the plaintiff often may succeed in identifying some unlawful practices of conditions, the range of possible success is vast. **That the plaintiff is a "prevailing party" therefore may say little about whether the expenditure of time was reasonable in relation to the success achieved.** (Emphasis added; citation and footnote omitted.)

These considerations - that any attorney fee award should reflect the degree of success that the prevailing party has obtained, and that the award should be reduced in proportion to the party's failure to achieve 100% success - have been reiterated in several decisions by the Sixth Circuit. *See, e.g., Granzeier v. Middleton,* 173 F.3d 568 (6th Cir. 1999); *Smith v. Jefferson County Bd. Of Sch. Comm'rs,* 788 F.3d 580 (6th Cir. 2015). In *Fox v. Vice,* 563 U.S. 826 (2011), the Court held the proportionality considerations which apply to evaluating the appropriate attorney fee award which should be approved for a prevailing plaintiff should likewise apply to a prevailing defendant, stating, *id.* at 834:

Analogous principles indicate that a defendant may deserve fees even if not all the plaintiff's claims were frivolous. In this context, §1988 serves to relieve a defendant of expenses attributable to frivolous charges. The plaintiff acted wrongly in leveling such allegations, and the court may shift to him the reasonable costs that those claims imposed on his adversary. … That remains true when the plaintiff's suit also includes non-frivolous claims. The defendant, of course, is not entitled to any fees arising from these non-frivolous claims. … But the presence of reasonable allegations in a suit does not immunize the plaintiff against paying for the fees that his frivolous claims imposed. …

The question then becomes one of allocation. In a lawsuit involving a mix of frivolous and nonfrivolous claims, what work may the defendant receive fees for? …

. . .

… Section 1988 allows a defendant to recover reasonable attorney's fees incurred because of, but only because of, a frivolous claim. Or what is the same thing stated as a but-for test: **Section 1988 permits the defendant to receive only the portion of his fees that he would not have paid but for the frivolous claim.** (Emphasis added; citation omitted.)

Since the Court of Appeals held that Plaintiffs had standing to sue and reversed the court's ruling to the contrary, the Protesters are not a prevailing party on this issue and under the holding in *Fox* may not be awarded any attorney fees for the time that their attorneys expended on supporting the court's erroneous ruling that the Plaintiffs did not have standing. That is, in order to determine what attorney fees the Protesters' attorneys are entitled to, we must be able to determine what legal work the attorneys would not have done, but for the issues which the court concluded were frivolous, i.e., the 1st Amendment and the 42 U.S.C. §§1981, 1982, 1983, and 1985(3) issues. Or, to put it another way, what legal work the Protesters' attorneys would have done but for the standing issue, which requires excluding the time expended on the standing issue.

The court, contrary to the holding of *Fox,* held that the Protesters were entitled to recover attorney fees for the time their attorneys expended on arguing that the Plaintiffs did not have standing, contrary to the "but for" test in *Fox.* The court asserted, at *11, that Plaintiffs "mischaracterize the law," by confusing a "claim" with a "contention." In so stating, the court contradicted its position at *7, where it asserted that the majority's ruling that Plaintiffs' claims were not frivolous referred only to the issue of standing, which it now asserted was a "contention," not a "claim." But the Court in *Fox* repeatedly referred to "claims" and made no mention of "contentions." Consequently, under *Fox,* the Protesters' attorneys were not entitled to any compensation for any of the time they devoted to arguing the standing issue. This would require being able to segregate from the time they expended on the 1st Amendment issue and the §§1981, 1982, 1983, and 195(3) issues the time they expended on the standing issue. As demonstrated in the next argument, however, this is not possible given the manner in which they recorded their billing time.

**B.**    **The Protesters' Attorneys' Time Records Failed To Segregate Time They Spent On The First Amendment And Federal Civil Rights Statutory Issues From The Time They Spent On The Standing Issue.**

Under the holding in *Fox,* a defendant is only entitled to recover fees for time which the defendant's attorney documents s/he spent on the precise claims over which the defendant prevailed. Here, the issues on which the Protesters are the prevailing party are the application of the free speech provision of the 1st Amendment as protecting their

conduct from injunctive relief and/or damages and the arguments relating to 42 U.S.C.

§§1981, 1982, 1983, and 1983(5).   In order to recover any attorney fees for time

expended on these issues, the attorneys must provide documentation of their time

expended on this issue, and only on this issue.  As the District Court stated in *Fharmacy*

*Records v. Simmons,* Case NO. 05-72126 (E.D. Mich. 2006) (J. Roberts) (copy attached

as Exhibit 2), *id.* at 4-5:

> Plaintiffs object that Defendants used "block billing" because the detail for
> two entries state that the time was spent on both drafting an Answer with
> affirmative defenses and drafting the Motion, but does not distinguish
> between the two.
>
> Defendants respond that the Motion and the Answer are "interconnected."
> Defendants fail to explain why they did not itemize time for the Motion
> only. The Court's Order only allows costs and fees incurred with the
> Motion, not any related matter. While Defendants' Reply includes a
> timeline of the work done concerning the Motion, it does not attempt to
> distinguish the time spent on the Motion from time spent on the Answer.
> As Plaintiffs noted earlier, because much of the research on the issues in
> this case was done for a previous motion in another case, there is no
> reasonable way for the Court to determine how many hours are attributable
> to the Motion only. Accordingly, $1,360.00 will be subtracted.

*See also Perry v. AutoZone Stores, Inc.,* 624 F. App'x 370 (6th Cir. 205) (reducing

attorney fees to be paid to plaintiffs because their attorneys block-billing made it

difficult to differentiate how much time was expended on what legal tasks); *Bell v.*

*Prefix Inc.,* 784 F. Supp.2d 778 (E.D. Mich. 2011) (same).

Nowhere in their time records, however, did the Protesters' attorneys identify the

amount of time they spent exclusively on researching and writing devoted to the

exclusively to the 1st Amendment or 42 U.S.C. §§1981, 1982, 1983, and 1985(3) issues. They are precluded from recovering attorney fees for any legal work devoted to the standing issue. The time records which they filed in conjunction with their motion for attorney fees failed to disambiguate what time was spent exclusively on the 1st Amendment and federal civil rights statutory issues. (*See* R. 84 and R. 85 and the time record exhibits included.)

Nowhere in their time records, however, did the Protesters' attorneys identify the amount of time they spent exclusively on researching and writing devoted to the exclusively to the 1st Amendment or 42 U.S.C. §§981, 1982, 1983, and 1985(3) issues. They are precluded from recovering attorney fees for any legal work devoted to the standing issue. The time records which they filed in conjunction with their motion for attorney fees failed to disambiguate what time was spent exclusively on the 1st Amendment and federal civil rights statutory issues.

Thus, their Exhibit 1 (R. 84-2) contained multitudinous time references which failed to specify how much time was devoted to what issue(s). For example, the entry for 02/19/20 indicates 2.0 hrs. for several tasks, without identifying what legal issues those tasks related to, standing or freedom of speech. The entry for 3/05/20 indicates 6.0 hrs. were devoted to several tasks, including "research e-mailed today re standing[.]" But they are not entitled to recover attorney fees for any time related to the issue of standing. On 05/05/20, there is an entry for .9 hr. relating to "Rev text order allowing

witness declaration under seal; rev motion; e-mail to team." What issues did this time entry relate to? Without identifying any relevance to the issue of freedom of speech or the civil rights statutes, they are not entitled to recover any attorney fees for this time. On 6/3/0 there is an entry for 4.0 hrs for "federal statute part of reply brief & rev JS part & make comments; had to drive to FL parking lot to send (n/c); groc gas station, Jim's finalize reply after reviewing JS edits to my part …" Nowhere do they specify how much of this time was related to the standing issue versus the freedom of speech/statutory issues. Yet all of this undifferentiated time is included in the total of 120.9 hrs. for $48,360.00. The following entries for HMD include numerous references to the default judgment issue, but this issue had absolutely nothing to do with standing or freedom of speech, yet all of this time is included in the total of 13.4 hours, claiming an entitlement to be compensated a total of $6,700.00. The same pattern of lack of specificity repeats itself over and over in the billing records.

Exhibit 1 of the billing records, which reflects the amount of time that was expended before the appeal by Constitutional Litigation Associates, indicates that CH expended a total of 120.9 hrs., without any issue differentiation; HMD expended a total of 13.4 hrs., without any issue differentiation; SM expended a total of 85.2 hrs., without any issue differentiation. All of this undifferentiated time is included in the table on p. 19.

John Shea's billing records (R. 84-4) reflect the same repeated lack of specificity:

2/29/20, 2.5 hrs. for "Office conference with Deb regarding status/next steps"; 3/16/20, 3.5 hrs. for "Prep for/conference call with team regarding drat motion to dismiss; further research/revisions to draft/circulate for further comment"; 3/21/20, 6.0 hrs. for "Review/draft edits to 'corrected' motion to dismiss, forward to team" (where the motion to dismiss included arguments on both standing and the 1st Amendment/statutory issues); 6/25/20, 4.5 hrs. for "Continue reviewing Gerber response to motion to dismiss, outlining thoughts for reply brief; conference call with Cindy/Scott regarding same; correspond with Korobkin; begin drafting my section of reply brief" (where Gerber's response addressed both the standing and the 1st Amendment issues, as did the Protesters' reply brief); etc., etc., etc.

The same lack of specificity is repeated in Constitutional Litigation Associates' billing records for their legal work on the appeal. Cynthia Heenan's time records for the appeal include an entry on 12/30/20, 5.5 hrs. for "draft Revise SOF & issues & Q re standard of review; also summary of argument, statement in support of oral argument; e-mails w/ team re order of arguments; e-mails from Scott re various inconsistencies …" (the Protesters' appellate brief included arguments on both issues, standing and 1st Amendment, even though the Appellants maintained that the only issue on appeal was the question of standing); 1/11/21, 3.5 hrs. for "tc w/ case manager; txt w JR & conf in, but had to lave same; later TC w/ case manager – ver confusing; said look at A'ants, but then it was not same as what she was saying, so then she did not want to talk about theirs

43

anymore; confusing re PageID requirements and purpose …" (none of this has anything to do with the 1st Amendment or statutory issue); etc., etc., etc. Cynthia Heenan's total time relating to the appeal is indicated as 38.6 hrs., 36.2 hrs. of which are included in the Protesters' table on p. 19.

Due to the failure of the Protesters' attorneys to properly specify and differentiate the time which was expended exclusively on the 1st Amendment freedom of speech and the federal statutory issues, and the commingling this time with the time devoted to the standing issue, with respect to which they were not the prevailing party, their fee petition pursuant to 42 U.S.C. §1988 should have been denied in its entirety. Although these deficiencies were pointed out in Dr. Brysk's Response (R. 89) to the Protester Defendants' Renewed Motion For Attorney Fees (R. 84), the court ignored them, based on its erroneous ruling that the Protesters were entitled to recover attorney fees for the legal work expended on the standing issue, and therefore they were not required to differentiate what time was devoted to the standing issue and what time was devoted to the 1st Amendment/statutory issues. This ruling was contrary to the explicit holding of *Fox.*

## CONCLUSION

Based on the above arguments, the District Court's Order and Judgment awarding attorney fees to the Protester Defendants must be vacated.

Respectfully submitted,

Marc M. Susselman (P29481)
Attorney at Law
43834 Brandywyne Rd.
Canton, Michigan 48187
(734) 416-5186
marcsusselman@gmail.com

/s/  Marc M. Susselman
Attorney for Dr. Miriam Brysk

Dated: May 12, 2022

# CERTIFICATE OF COMPLIANCE

The undersigned certify that they have used Word font Times Roman, 14 pt., in the writing of the Corrected Appellate Brief Of Appellants/Cross-Appellees. The total number of words, beginning with The Statement In Support Of Jurisdiction and ending with the Conclusion is exactly 12,991 words, using Word's word count application.

<div style="margin-left: 50%;">

Marc M. Susselman (P29481)
Attorney at Law
43834 Brandywyne Rd.
Canton, Michigan 48187
(734) 416-5186
marcsusselman@gmail.com

/s/  Marc M. Susselman
Attorney for Dr. Miriam Brysk

</div>

Dated: May 12, 2022

## CERTIFICATE OF SERVICE

The undersigned certifies that he served a copy of the Plaintiff-Appellant/Cross-Appellee Miriam Brysk's Corrected First Appellate Brief on each of the attorneys of record via the ECF system of the Sixth Circuit Court of Appeals on May 12, 2022.

<div style="margin-left: 40%;">

Marc M. Susselman
(P29481) Attorney at Law
43834 Brandywyne Rd.
Canton, Michigan 48187
(734) 416-5186
marcsusselman@gmail.com

</div>

By:                       /s/  Marc M. Susselman
                                   Attorney for Dr. Miriam Brysk

Dated: May 12, 2022

## **ADDENDUM**

R. 1 (Complaint)

R. 11 (Plaintiffs' First Amended Complaint, "FAC")

R. 11, Exhibit 3 (Photographs of signs in front of Beth Israel Synagogue)

R. 11, Exhibit 4 (Photographs of signs across the road from Beth Israel Synagogue)

R. 22 (Plaintiffs' Response to Protester Defendants' Motion to Set Aside Default)

R. 22, Page ID #554-598; 611-620

R. 22, Exhibit 4 (Affidavit of Marvin Gerber)

R. 22, Exhibit 5 (Affidavit of Miriam Brysk)

R. 22, Exhibit 6 (Affidavit of Jacqueline Shapo)

R. 22, Exhibit 7 (Affidavit of Mara Isser Sax)

R. 22, Exhibit 11 (Affidavit of Gabrielle Shapo)

R. 50 (Plaintiffs' Response Opposing the City Defendants' Motion To Dismiss)

R. 50, Page ID #1333

R. 50, Exhibit 1 (Photograph of Israeli flag, with circle bisected by a slash superimposed over the Star of David)

R. 54 (Plaintiffs' Response Opposing the Protester Defendants' Motion To Dismiss)

R. 54, ID #1738, 1740-1743

R. 55 (Request for Leave to File a Motion for Entry of a Preliminary Injunction Against the Protester Defendants)

R. 58 (Order Denying Plaintiffs' Request for Leave to File a Motion for Entry of a Preliminary Injunction Against the Protester Defendants)

R. 60 (Request for Leave to File a Motion for Partial Summary Judgment against the City Defendants Regarding Interpretation of the City's Code)

R. 63 (Order Denying Plaintiffs' Request for Leave to File a Motion for Partial Summary Judgment Against the City Defendants Regarding Interpretation of the City Code)

R. 66 (Final Order Dismissing Lawsuit)

R. 66, Page ID #1905

R. 69 (Order Denying Plaintiffs' Motion For Reconsideration)

R. 70 (Notice of Appeal)

R. 84 (Renewed Motion For Attorney Fees And Sanctions)

R. 84-2 (Time Records)

R. 84-4 (Time Records)

R. 85 (Defendants' Supplemental Brief)

R. 86 (Brysk's Motion To Dismiss Renewed Motion For Attorney Fees)

R. 89 (Brysk's Response To Renewed Motion For Attorney Fees)

R. 103 (Order Granting In Part And Denying In Part Protester Defendants')

R. 107 (Brysk's Notice of Appeal)

R. 109 (Gerber's Notice of Appeal)

R. 112 (Notice of Cross Appeal)

R. 114 (Gerber's Motion For Stay)

R. 119 (Order Denying Motion For Stay)

## <u>INDEX OF EXHIBITS</u>

**Exhibit 1**      A Proclamation on Days of Remembrance Of Victims Of the Holocaust, 2022

**Exhibit 2**      *Fharmacy Records v. Simmoons,* Case No. 05-7126 (E.D. Mich. 2006)

# EXHIBIT 1

BRIEFING ROOM

# A Proclamation on Days Of Remembrance Of Victims Of The Holocaust, 2022

APRIL 22, 2022  •  PRESIDENTIAL ACTIONS

On *Yom HaShoah*, Holocaust Remembrance Day, and throughout this week of remembrance, we reflect on the horrors of the Holocaust when the Nazi regime systematically murdered 6 million Jews and millions of other innocents, including Roma, Sinti, Slavs, persons with disabilities, LGBTQI+ individuals, political dissidents, and many others.  We stand with Jewish people in the United States, Israel, and around the world in grieving one of the darkest chapters in history.  We honor the memories of the victims.  We embrace the survivors.  We commit to keeping alive the promise of "never again."

The world must never forget the truth of what happened across Europe during the Holocaust or forget the horrific crimes and suffering the Nazi regime inflicted on millions of innocent people.  Entire families were wiped out.  Communities were shattered.  Survivors were left with agonizing memories and fading tattoos etched into their skin by the Nazis, reducing them to numbers.  It is forever recorded into the history of mankind, and it is the shared responsibility of us all to ensure that the *Shoah* is never erased from our collective memory — especially as fewer and fewer survivors remain.  The truth must always be known and shared with future generations in perpetuity.

I have taught my own children and grandchildren about the horrors of the Holocaust, just as my father taught me.  I have taken my family to bear witness to the darkness at the Dachau concentration camp so that they could understand why we must always speak out against antisemitism and hatred in all of its pernicious forms.  The legacy of the Holocaust must always remind us that silence in the face of such bigotry is complicity.

Remembrance is our eternal duty, but remembrance without action risks becoming an empty ritual.  As individuals, we must never be indifferent to human cruelty and human suffering.  As nations, we must stand together across the international community against antisemitism, which is once again rearing its ugly head around the world.  We must combat other forms of hatred and educate new generations about the Holocaust.  We must reject those who try to deny the Holocaust or to distort its history for their own ends.  We recognize that, just as the

Holocaust was an act of pure antisemitism, so too Holocaust denial is a form of antisemitism. We watch with dismay as the term "Nazi" is deployed to make flawed historical parallels. Efforts to minimize, distort, or blur who the Nazis were and the genocide they perpetrated are a form of Holocaust denial and, in addition to insulting both the victims and survivors of the Holocaust, spread antisemitism.

My Administration has stepped up our efforts to counter all the ugly forms antisemitism can take, including Holocaust denial and distortion. We co-sponsored a United Nations resolution that charged the international community with combating Holocaust denial through education. We are partnering with the German government to improve Holocaust education and counter Holocaust denial and distortion. A renowned scholar of the Holocaust and antisemitism, Deborah Lipstadt, was recently confirmed as Special Envoy to Monitor and Combat Antisemitism.

In addition to speaking out against the evils of antisemitism, I signed — and my Administration continues to implement — legislation that gives us more tools to combat crimes that are based on a victim's actual or perceived race, religion, national origin, sexual orientation, gender, gender identity or disability. We issued the first-ever National Strategy for Countering Domestic Terrorism. My Administration has implemented increased funding for a program that helps threatened nonprofits — including houses of worship and other religious affiliated entities — to improve their safety and security. On International Holocaust Remembrance Day, I met with Bronia Brandman and the Vice President met with Ruth Cohen — both Auschwitz survivors — at the White House so we could bear witness to their stories, combat Holocaust denial and distortion, and give life to the lessons of that most terrible period in human history.

Those like Bronia and Ruth who survived the Holocaust and went on to build new lives inspire our Nation and the world, and they are living testaments to the enduring resilience of the human spirit. It is the responsibility of all of us to recognize the pain that they carry and to support them by ensuring that the cruelty of the Holocaust is never forgotten. Today and every day, we stand against antisemitism and all other forms of hate and continue our work to ensure that everyone can live in a world that safeguards the fundamental human dignity of all people.

NOW, THEREFORE, I, JOSEPH R. BIDEN JR., President of the United States of America, by virtue of the authority vested in me by the Constitution and the laws of the United States, do hereby proclaim April 24 through May 1, 2022, as a week of observance of the Days of Remembrance of Victims of the Holocaust, and call upon the people of the United States to observe this week and pause to remember victims and survivors of the Holocaust.

IN WITNESS WHEREOF, I have hereunto set my hand this twenty-second day of April, in the year of our Lord two thousand twenty-two, and of the Independence of the United States of America the two hundred and forty-sixth.

JOSEPH R. BIDEN JR.

**EXHIBIT 2**

# Fharmacy Records v. Simmons

Decided Aug 21, 2006

Case No. 05-72126.

August 21, 2006

## ORDER

VICTORIA ROBERTS, District Judge

### I. INTRODUCTION

This matter is before the Court on Defendants'[1] Bill of Costs. For the following reasons, the Court awards Defendants $4,115.50.

> [1] For purposes of this Memo, "Defendants" refers only to the Universal Defendants and Curtis Jackson.

## II. BACKGROUND

This action arises out of the alleged unauthorized use and reproduction by the *2 Defendants of a musical composition created by Plaintiffs.

The underlying facts are sufficiently set forth in the Court's Order granting Defendants' Motion for partial dismissal and for reasonable costs and attorney fees ("the Motion") entered January 20, 2006. [Doc. 56], "incurred in bringing [the Motion]," pursuant to 28 USC § 1927.

On February 8, 2006, Defendants filed a Bill of Costs seeking a total of $8,147.87. They included a detailed summary of the charges.

Plaintiffs filed an objection to the Bill of Costs on February 22, 2006. They claim that Defendants: (1) overstaffed; (2) included fees outside the scope of the Court's Order; (3) used block billing that did not segregate the time spent on the Motion at issue; (4) included costs for preparing a reply brief; and (5) failed to establish that some of the costs billed were incurred in connection with the Motion.

## III. STANDARD OF REVIEW

"The party seeking attorneys fees bears the burden of documenting his entitlement to the award." *Reed v. Rhodes,* 179 F.3d 453, 472 (6th Cir. 1999). "The fee applicant should submit evidence supporting the hours worked and rates claimed. Where the documentation of hours is inadequate, the district court may reduce the award accordingly." *Id.*

## IV. APPLICABLE LAW AND ANALYSIS

### A. Overstaffing

Plaintiffs claim Defendants overstaffed by having an associate and a partner involved in the preparation of the Motion, particularly because much of the research on *3 the pertinent issue was already done for a similar motion in another case. Plaintiff cites no authority to support its contention that an associate and a partner working on the same motion is overstaffing.

As Defendants point out, the partner, Mr. Quick, was minimally involved in the preparation of the Motion. Additionally, it is not unreasonable that a partner would be involved with an associate on a motion for partial dismissal. Thus, the Bill of Costs will not be reduced for alleged overstaffing.

## B. Fees Outside the Scope of the Court's Order



Plaintiffs argue Defendants billed for fees outside the scope of the Court's Order because they were not incurred as a result of filing the Motion. Plaintiffs challenge several charges.

## 1. Charges for review and correspondence related to notice of withdrawal

Plaintiffs argue two entries on July 5, 2005 are outside the scope of the Court's Order. One of the entries is for 0.8 of an hour for emails concerning status and conversation between the partner and associate regarding Plaintiffs' offer to withdraw counts II and III. The other is for 0.4 of an hour to review and analyze Plaintiffs' notice of withdrawal of counts II and III and correspondence regarding the notice. Both entries occurred after filing the Motion.

These charges were not reasonably incurred in bringing the Motion because the Motion was already filed when these entries occurred. Thus, $316.00 will subtracted from Defendants' bill.

### 2. Charges for preparation of Bill of Costs

4    *4

Plaintiffs contend Defendants cannot bill for time spent preparing the Bill of Costs because it is not a cost incurred in filing the Motion.

The Court finds that fees for the preparation of the Bill of Costs were reasonably incurred. Defendants incurred the fees as part of the vindication of their rights via the Motion; they would not have incurred the fees otherwise.

## 3. Charges for emails on 06/17/2006

Plaintiffs challenge 0.6 hours spent on June 17, 2006 for emails to Defendants' client regarding the "matter" and an unidentified letter from Reed.

"The documentation offered in support of the hours charged must be of sufficient detail and probative value to enable the court to determine

with a high degree of certainty that such hours were actually and reasonably expended . . ." *United Slate v. GM Roofing and Sheet Metal Company,* 732 F.2d 495, 502, n. 2 (6th Cir. 1984).[2] The detail provided by Defendants is insufficient to determine what "matter" the entry relates to. Further, in Defendants own timeline provided in their Reply, they do not include any work relating to the Motion occurring prior to June 21, 2005. [Reply, p. 2]. Thus, $177.00 will be subtracted.

> [2] Although *United Slate* did not address attorney fees specifically under § 1927, the reasoning is applicable here.

## C. Block Billing

Plaintiffs object that Defendants used "block billing" because the detail for two entries state that the time was spent on both drafting an Answer with affirmative defenses and drafting the Motion, but does not distinguish between the two.

5    Defendants respond that the Motion and the Answer are "interconnected." *5 Defendants fail to explain why they did not itemize time for the Motion only. The Court's Order only allows costs and fees incurred with the Motion, not any related matter. While Defendants' Reply includes a timeline of the work done concerning the Motion, it does not attempt to distinguish the time spent on the Motion from time spent on the Answer. As Plaintiffs noted earlier, because much of the research on the issues in this case was done for a previous motion in another case, there is no reasonable way for the Court to determine how many hours are attributable to the Motion only. Accordingly, $1,360.00 will be subtracted.

## D. Costs for Preparing Reply to the Motion

Plaintiffs claim that a Reply was unnecessary because they voluntarily withdrew. This is clearly incorrect because the Court held Plaintiffs were not able to voluntarily withdraw because Defendants had already filed their Answer.

Plaintiffs also claim the fees associated with preparing, revising and editing the Reply to the Motion are excessive and unreasonable.

Defendants do not respond to Plaintiffs claim that the time spent preparing the Reply was excessive or unreasonable. However, the entry of August 10, 2005 details the time spent as "[d]raft reply brief in support of motion for partial summary judgment . . . [d]raft response to motion for leave for Plaintiff to file a late response brief." [Bill of Costs, Exhibit B, p. 4]. Defendants do not delineate what time was spent preparing the Reply to the Motion and what time was spent preparing the response to the other motion.

The response referenced in Defendants' entry of August 10, 2005 refers to a response to Plaintiffs' motion to file a late response to the Motion for partial dismissal. *6 While the fees associated with the response to the motion for leave to file a late response would be deemed incurred as part of the Motion, the motion to file a late response was terminated on August 3, 2005, seven days before Defendants prepared the response. Accordingly, those fees cannot be included; they were unnecessary.

Because Defendants failed to separate the fees associated with the Reply and the response, as discussed above, there is no way for the Court to determine what time is attributable to each. Accordingly, the 6.7 hours billed will be subtracted. The remaining 5.2 hours for drafting, revising and editing the Reply are reasonable.

## E. "Actual Costs"

Plaintiffs challenge Defendants billing for "actual costs" for computerized research; facsimile; and reproduction. The charges total $839.37. They argue Defendants failed to identify what matter the research was on; and, what documents were reproduced or transmitted via facsimile. Additionally, Plaintiffs point out that two of the entries do not have dates.

Defendants assert the actual costs were related to the Motion and were incurred by sending materials to the client and corresponding with Plaintiffs' counsel. Defendants maintain that the computerized legal research was "incurred in connection with drafting the initial motion and brief, as well as the reply brief." [Reply, p. 5]. However, as Plaintiffs note, the computerized research took place after the Motion was filed.

Defendants fail to properly itemize the "actual costs" in such a way that allows the Court to review them for reasonableness. There is no indication of: (1) how many copies Defendants made or facsimiles they transmitted; (2) what documents the *7 charges pertain to; or (3) what rate they charged. Further, Defendants do not indicate what the computerized legal research pertained to. Accordingly, $839.37 will be subtracted.

## F. Total Bill

In a footnote, Defendants submit that it expended three hours at a rate of $210.00 per hour drafting the Reply to Plaintiffs' objection to the Bill of Costs. [Reply, p. 6, n. 1]. However, Defendants failed to submit any supporting documentation.

Evidence supporting the hours worked and the rates claimed is necessary to establish a claim for attorneys fees. *Granada Investment, Inc. v. DWG Corporation,* 962 F.2d 1203, 1208 (6th Cir. 1992). In the absence of an affidavit, or any other evidence to support Defendants' allegation, the charge for preparing the Reply to the Bill of Costs is not reasonable.

Pursuant to the adjustments made in this Memo, Plaintiffs owe Defendants $4,115.50.

## V. CONCLUSION

For the foregoing reasons, the Court awards Defendants $4,115.50 for reasonable costs and attorney fees incurred in bringing the Motion for partial dismissal. This amount is to be paid by Plaintiff's counsel within 30 days of this Order.

IT IS SO ORDERED. [1]

casetext